Submitted February 22, 2013, reversed and remanded January 29, petition for review allowed June 4, 2014 (355 Or 567)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM RICK DELONG,
*Defendant-Appellant.*

Douglas County Circuit Court
09CR1050FE; A146907

320 P3d 653

Peter Gartlan, Chief Defender, and Ryan T. O'Connor, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant challenges his conviction for unlawful possession of methamphetamine, ORS 475.894, and assigns error to the trial court's denial of his motion to suppress evidence. After stopping defendant for failure to wear a seat belt, a deputy sheriff sergeant questioned defendant while he was handcuffed in the sergeant's patrol car. During questioning and before he received *Miranda* warnings, defendant said that the deputies could search his vehicle. Another deputy sheriff conducted the search, found a fanny pack under the passenger seat, and opened it, thereby discovering the methamphetamine. Defendant contends that the trial court should have suppressed his statements and the physical evidence due to the violation of his rights under Article I, section 12, of the Oregon Constitution. We agree and reverse and remand for further proceedings.

We present the facts from the trial court's findings and the suppression hearing, viewed in the light most favorable to the state. *State v. Guggenmos*, 350 Or 243, 245, 253 P3d 1042 (2011); *State v. Pickle*, 253 Or App 235, 237, 288 P3d 1039 (2012), *rev den*, 353 Or 428 (2013). Defendant and his passenger, Keith, were driving in Douglas County when Sergeant Robeson observed that defendant was not wearing a seatbelt. Robeson stopped defendant and asked him for his driver's license, but defendant did not produce a license or any other form of picture identification. Robeson then asked defendant to step out of the car and detained him to verify his identity. Robeson handcuffed defendant, searched him, and placed him in the back of his patrol car. Deputy Poe arrived to assist around the time Robeson was taking defendant into custody.

Robeson and Poe both attempted to identify defendant. Robeson asked defendant questions about his identity and filled out a form based on defendant's responses. Defendant told Robeson that he was from Utah and gave him other identifying information, which Robeson then gave to dispatch to search for an Oregon or Utah driver's license. Meanwhile, Poe used his in-car computer to search for more information about defendant, including looking for mug shots from the local jail and "wants and warrants."

Before dispatch responded, Robeson further asked defendant whether there was "anything in the vehicle that we should be concerned about." Defendant answered "no" to that. Robeson did not ask for consent to search; however, defendant then volunteered that, if the deputies wanted to "search the vehicle," they could.

Poe found that there was a restraining order entered against defendant and informed Robeson, who then told Poe about defendant's consent to search the car. Poe conducted the search while Robeson interviewed Keith. Among other things, Poe found a fanny pack under the passenger seat. He showed it to Keith and asked whether it was hers. She said that it did not belong to her. Poe then opened the fanny pack and found several small zip-lock plastic bags, a pill bottle, and plastic straws, all containing a white powder residue.

Poe and Robeson then returned to defendant after a third deputy, Thornton, arrived to assist. Poe gave defendant *Miranda* warnings and asked questions about what Poe had found in the car. Defendant then made incriminating statements, including admitting that the fanny pack was his and that there was drug paraphernalia in it. Thornton's field test on one of the plastic bags indicated that the white residue it contained was methamphetamine.

In seeking to suppress all evidence resulting from the search, including his incriminating statements, defendant argued, among other things, that the evidence should be suppressed because of a *Miranda* violation. Defendant contended that he was in custody and under compelling circumstances while he was handcuffed in the police vehicle and that Robeson was asking defendant questions without giving required *Miranda* warnings for the purpose of furthering a criminal investigation, beyond issuing a traffic citation. His consent to search the vehicle, he argued, was invalid because it was obtained during that period of questioning. Defendant also contended that, even if he had validly consented to a search of the vehicle, the state did not meet its burden to establish that his consent extended to a search of all of the vehicle's contents and closed containers. Thus, the search of the fanny pack was "not within the scope of the consent search" and, without a warrant, was illegal.

To counter those arguments, the state asserted that defendant was not being interrogated when Robeson asked him about "anything of concern" in the vehicle. The state characterized that as part of routine questioning in connection with an attempt to positively identify defendant and asserted that no *Miranda* warnings were required. The state further argued that defendant had volunteered his consent to a search of the vehicle and, because no one else claimed to own the fanny pack, the officers had consent to search the fanny pack.

The trial court agreed with the state. It concluded that no *Miranda* warnings were required until Poe returned to defendant after having discovered the fanny pack and that defendant volunteered his consent to a search of the car, upon which Poe was entitled to rely when he opened the fanny pack.

On appeal, the state's position and the locus of the disputed issues have shifted. The state now concedes that *Miranda* warnings were required because defendant was in custody while handcuffed and being questioned in the police vehicle. Nevertheless, the state contends that the trial court correctly denied suppression of the evidence given defendant's spontaneous offer of consent to search his car while he was in custody. Defendant generally reprises the arguments he made in the trial court, asserting that, under *State v. Vondehn*, 348 Or 462, 236 P3d 691 (2010), his consent to a search of the vehicle, other statements he made, and the discovery of the physical evidence all derived from a violation of Article I, section 12, and should be suppressed. To address the trial court's determination that he spontaneously volunteered consent to search his car, defendant asserts that the questioning without a *Miranda* warning directly affected his responses and that he offered the search in an attempt to extricate himself from the situation by appearing to have nothing to hide; thus, the fact that he volunteered, rather than was asked to give, consent is of no consequence in the causal chain of events that led from a violation of his rights to the state's acquisition of evidence against him.

As noted at the outset, we conclude that the trial court erred when it denied defendant's motion to suppress.

This case is largely governed by the principles and reasoning that the Supreme Court set forth in *Vondehn*, and so we discuss that case in some detail.

In *Vondehn*, the Supreme Court closely examined the basis for the requirement that police inform people in custody of their right against self-incrimination under Article I, section 12, of the Oregon Constitution. The court explained that,

> "[b]ecause a custodial interrogation is inherently compelling, and to ensure the validity of a waiver of the right against self-incrimination, Article I, section 12, requires that the police inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution. Article I, section 12, requires those *Miranda* warnings to ensure that a person's waiver is knowing as well as voluntary. If the police conduct a custodial interrogation without first obtaining a knowing and voluntary waiver of the suspect's rights, then they violate the suspect's Article I, section 12, rights."

348 Or at 474.

The Supreme Court also examined the remedies for a violation of an individual's Article I, section 12, rights. The court explained that, since *State v. Magee*, 304 Or 261, 744 P2d 250 (1987), it consistently had held "that the Oregon Constitution requires suppression of statements made without the benefit of *Miranda* warnings." *Vondehn*, 348 Or at 472. It further held that, when the police violate Article I, section 12, such as by failing to give *Miranda* warnings, "the state is precluded from using evidence derived from that violation to obtain a criminal conviction," *id.* at 475-76, including "physical evidence that is derived from that constitutional violation," *id.* at 476.

On facts similar to those in this case, the court applied those principles to suppress evidence of the defendant's statements and the marijuana found in his backpack during a brief custodial interrogation before he was given *Miranda* warnings. The defendant in *Vondehn* was handcuffed and placed in the back seat of a patrol car. An officer

then asked the defendant two questions about the backpack that the police had found in the car in which the defendant had been a passenger. In response to the first question, the defendant admitted that he owned the backpack and that it contained marijuana. The officer next asked whether the police could search it, and the defendant consented. Relying on his consent, the officer searched the backpack, discovered marijuana, gave the defendant *Miranda* warnings, and questioned him further. *Id.* at 464. The Supreme Court held that the police violated the defendant's rights under Article I, section 12, and that the defendant's two responses and the marijuana derived from that violation should be suppressed. *Id.* at 476. In so holding, the court noted that the state had not argued that the request for consent to search or the seizure of the marijuana "derived from some source other than" the defendant's answers to questions posed before he received *Miranda* warnings. *Id.*

Like the defendant in *Vondehn,* defendant in this case was in custody while handcuffed in the sheriff's patrol car, and Robeson should have provided defendant with *Miranda* warnings, as the state now acknowledges. Defendant correctly asserts on appeal, and the state concedes, that, when Robeson asked defendant whether he had "anything we should be concerned about" in the car, Robeson was interrogating defendant without having informed defendant of his *Miranda* rights. *See State v. Schwerbel,* 233 Or App 391, 399, 226 P3d 100, *rev den,* 349 Or 172 (2010) ("readily" concluding that the officer's question to the defendant "about possessing 'anything' that [the officer] 'needed to be aware of' was a question that was reasonably likely to elicit an incriminating response").

Because of that violation of his rights under Article I, section 12, defendant argues that we must reverse given the causal connection between the unwarned interrogation and the initial statements he made and the discovery of the drugs and drug paraphernalia in the fanny pack, which were then followed by his admissions concerning those items. Citing *State v. Ayles,* 348 Or 622, 237 P3d 805 (2010), defendant asserts that the incriminating statements he made when confronted with the drugs and drug paraphernalia should have been suppressed, despite the fact that he made those

statements after being given belated *Miranda* warnings, because his statements were the product of the discovery of the physical evidence in the fanny pack. Defendant further argues that the state failed to meet its burden to prove that the causal connection between the constitutional violation and the evidence to be suppressed should be disregarded, for example, because the deputies inevitably would have discovered the evidence through lawful procedures or because the deputies obtained the evidence from an independent source.

For its part, the state agrees that there is a causal connection between Robeson's interrogation of defendant without *Miranda* warnings and the discovery of the evidence in the car. And, the state makes no argument that defendant's subsequent incriminating statements lack any causal connection to the constitutional violation. However, the state contends that, because "defendant voluntarily offered his consent to a search of his vehicle" (even while subjected to the custodial interrogation without *Miranda* warnings), that consent "severed any unlawful taint" of the Article I, section 12, violation. The state argues that the causal connection between the constitutional violation and the evidence in this case is "too tenuous" to allow defendant a remedy, relying primarily on two cases involving the protections in Article I, section 9, of the Oregon Constitution against unreasonable searches and seizures, *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), and *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993).

We reject the state's argument that those cases are persuasive in our analysis of the causal connection between the violation of defendant's rights under Article I, section 12, and the evidence to be suppressed in this case. Although *Kennedy* involved a motion to suppress after the defendant spontaneously consented to a search of his luggage, 290 Or at 496, that case concerned the voluntariness of consent to a warrantless search, *id.* at 499-501. As we recently observed in *State v. Marshall*, 254 Or App 419, 428 n 10, 295 P3d 128 (2013), although a case involving a waiver of constitutional rights in the search and seizure context under Article I, section 9, can have some commonality with a case involving a waiver of rights against self-incrimination in the Article I, section 12, context, it is important to remember a significant

difference between the two: "valid waiver of an accused's right against self-incrimination under Article I, section 12, of the Oregon Constitution must be both *knowing* and voluntary, whereas valid consent to search under Article I, section 9, need only be voluntary." (Emphasis in original.) *Kennedy* did not address the knowing waiver of a constitutional right.

*Rodriguez* also involved a warrantless search, 317 Or at 29, but one conducted when the defendant spontaneously volunteered consent to a search of his apartment after he was arrested, had received *Miranda* warnings, and was asked whether he had any guns or drugs in his apartment, *id.* at 30. The Supreme Court noted that the defendant was free not to answer the question in light of his understanding of his *Miranda* rights. *Id.* at 41 n 15. The court held that there was no violation of the defendant's rights under Article I, section 9, because the police had not done anything during the encounter to "exploit any unlawful conduct to obtain" the defendant's consent to the search. *Id.* at 41. This case, though, involves the failure to provide *Miranda* warnings. Thus, neither *Kennedy* nor *Rodriguez* addresses whether an individual's rights against self-incrimination under Article I, section 12, should be vindicated through suppression of evidence when the individual under interrogation spontaneously consents to a search without having received *Miranda* warnings.

*Vondehn* suggests the answer to that question, because in both that case and this one, the causal connection is direct, with the police obtaining evidence through their failure to ensure that the persons in custody knowingly waived their right against self-incrimination. In *Vondehn*, the Supreme Court concluded that both the defendant's unwarned affirmative response to the question whether the police could search his backpack, as well as the physical evidence discovered during the resulting search, should be suppressed because his response and the physical evidence were "derived from" the Article I, section 12, violation. In this case, although Robeson did not specifically ask defendant to provide consent to a search, we agree with defendant that his unwarned statement giving consent to search was prompted by Robeson's question during a custodial interrogation, which is "inherently compelling." *Vondehn*, 348 Or

at 474. Although the trial court determined that defendant gave consent voluntarily, we also agree with defendant that the deputies exploited, or took advantage of, the Article I, section 12, violation to obtain his consent; he offered consent during a custodial interrogation while denying any wrongdoing. Thus, the police proceeded and obtained consent without securing from defendant both "a knowing and voluntary waiver" of rights under Article I, section 12. *Id.* Finally, the state does not offer a separate response to defendant's contention that the deputies exploited the Article I, section 12, violation by confronting him with the unlawfully discovered physical evidence and using that evidence to obtain his admissions. *See Ayles*, 348 Or at 638-39 (affirming suppression of incriminating statements and physical evidence, because they were derived from illegal police conduct and the giving of *Miranda* warnings did not "break the causal chain" of events, which went from illegal seizure, to illegal search, to discovery of some physical evidence, to arrest and the giving of *Miranda* warnings, and to the defendant's admissions and the discovery of additional physical evidence). Accordingly, we reverse and remand.

Reversed and remanded.