*367 KISTLER, J.
During a traffic stop, a deputy sheriff placed defendant in custody and then asked him, without first advising him of his Miranda rights, “if there was anything we should be concerned about” in his car. Defendant “told [the deputy] ‘no,’ and that if we wanted to search the vehicle, we could.” On appeal, the state conceded that the deputy violated Article I, section 12, of the Oregon Constitution when he asked defendant that question without first advising him of his Miranda rights. The state argued, however, that the physical evidence that the deputies later found in defendant’s car did not “derive from” the Miranda violation. The Court of Appeals disagreed. State v. Delong, 260 Or App 718, 320 P3d 653 (2014). Relying on State v. Vondehn, 348 Or 462, 236 P3d 691 (2010), the Court of Appeals reasoned that both defendant’s offer and the resulting evidence derived from the violation. Having allowed the state’s petition for review, we reverse the Court of Appeals decision and remand this case to the Court of Appeals.
Sergeant Robeson worked for the Douglas County Sheriffs office.[1] One evening, while Robeson was on patrol, defendant’s car pulled out in front of Robeson. Apparently noticing Robeson’s marked patrol car behind him, defendant “immediately pulled off’ into a store parking lot. Robeson continued driving, went around the corner, and pulled over to the side of the road to see if defendant would resume driving once Robeson passed by. “[A] few seconds later,” defendant drove past Robeson. In doing so, defendant confirmed Robeson’s suspicion that he had been trying to avoid Robeson, and he also gave Robeson the opportunity to see that he was not wearing a seat belt.
Robeson stopped defendant for that traffic violation. See ORS 811.210 (requiring that drivers wear seat belts). He approached defendant’s car and asked him for his driver’s license, registration, and proof of insurance. Defendant gave Robeson his name but could not produce a driver’s license or other picture identification. Driving without a license is a traffic offense; however, it is a defense to that charge *368 that the driver in fact had a valid license. See ORS 807.570. Robeson sought to determine defendant’s identity so that he could see if defendant in fact had a valid license. Robeson also wanted to identify defendant to see if there was a reason why defendant apparently had sought to avoid him; specifically, Robeson wanted to see if there was an outstanding warrant for defendant’s arrest.
There was a passenger in defendant’s car, and Robeson removed defendant from his car, frisked and handcuffed him, and put him in the backseat of the patrol car before asking him some background questions to verify his identity.[2] At that point, Robeson had not advised defendant of his Miranda rights. After asking some questions regarding defendant’s identity, Robeson asked defendant “if there was anything we should be concerned about” in his car.[3] In response to that question, defendant “told [Robeson] ‘no,’ and that if we wanted to search the vehicle, we could.”[4] Robeson relayed that response to another deputy, who had arrived at the traffic stop. The second deputy searched defendant’s car and found what appeared to be marijuana residue in an ashtray underneath the driver’s seat. He then opened a canvas fanny pack that was inside the car, where he found methamphetamine and drug paraphernalia. At that point, the second deputy advised defendant of his Miranda rights. Defendant stated that he understood his rights and then *369 acknowledged that the methamphetamine and drug paraphernalia were his.
Before trial, defendant moved to suppress both the physical evidence found during the search of his car and the statements that he made afterwards on the ground that the deputies had unlawfully extended the stop. At the hearing on that motion, defendant raised another ground for suppressing that evidence. He argued that, when Robeson asked him if there was anything he should be concerned about in the car, Robeson violated his state and federal Miranda rights.[5]
In the trial court, the state responded that Robeson’s question did not constitute interrogation. In the state’s view, that question was no different from the background questions regarding identity that had preceded it. The trial court denied defendant’s suppression motion. It ruled that the deputies had not unlawfully extended the stop, and it agreed with the state that Miranda warnings were not required, apparently on the ground that Robeson’s question had not constituted interrogation. The trial court accordingly denied defendant’s suppression motion and ruled that the physical evidence found in defendant’s car and the warned statements that he made to the second deputy were admissible at his trial. Considering that and other evidence, the jury found defendant guilty of possessing methamphetamine.
On appeal, defendant challenged the trial court’s ruling on his suppression motion. He argued that, once Robeson placed him in the back of his patrol car and handcuffed him, Article I, section 12, required Robeson to advise him of his Miranda rights before asking him whether there was anything in his car that should concern the deputies.[6] The state, in response, conceded that Robeson had violated *370 Article I, section 12, of the Oregon Constitution when he asked defendant that question without first advising him of his Miranda rights. The state argued, however, that, because defendant’s invitation to search his car attenuated the taint of the Miranda violation, the physical evidence that the deputies discovered in the car was not the product of the violation.
The Court of Appeals held that Article I, section 12, required Robeson to advise defendant of his Miranda rights before asking him if there was anything in the car that should concern the deputies. Delong, 260 Or App at 724. It also held that the physical evidence the deputies found in defendant’s car “derived from” that violation under this court’s decision in Vondehn. Id. at 726-27. The court reasoned that Robeson “exploited, or took advantage of, the Article I, section 12, violation to obtain [defendant’s] consent; he offered consent during a custodial interrogation while denying any wrongdoing.” Id. at 727. The court accordingly held that the trial court should have suppressed the physical evidence discovered in defendant’s car and the statements that defendant made after receiving Miranda warnings.
We allowed the state’s petition for review to consider whether, under Article I, section 12, the physical evidence that the deputies discovered in defendant’s car “derived from” the earlier Miranda violation. See Vondehn, 348 Or at 476 (stating that standard). On that issue, defendant argues that, because his invitation to search his car was the foreseeable result of the deputy’s unwarned question, the evidence that the deputies found in his car derived from that Miranda violation and should be suppressed. The state responds that, because Miranda is a judge-made rule and not a constitutional right, we should suppress only the evidence that resulted directly from the Miranda violation. In the state’s view, we should not suppress the evidence that resulted directly from a Miranda violation and the “fruit of the poisonous tree,” as we ordinarily do for state constitutional violations.[7] Alternatively, *371 the state argues that, even if we suppress both the direct evidence resulting from the Miranda violation and the “fruit of the poisonous tree,” our Article I, section 9, cases demonstrate that the evidence that the deputies found in defendant’s car was not the fruit of the poisonous tree and thus did not derive from the Miranda violation.
Our decision in Vondehn provides the starting point for our analysis. Accordingly, we first describe that decision. We then explain that the specific holding in Vondehn does not control the resolution of this case. We also explain that, even if we apply the remedial standard that we ordinarily apply to Article I, section 9, violations, defendant’s invitation to search his car attenuated the taint from the Miranda violation. Finally, we address defendant’s argument and the dissents’ view that, even if defendant’s invitation to search his car would be sufficient to attenuate the taint of an Article I, section 9, violation, his invitation was not sufficient to attenuate the taint of an Article I, section 12, violation.
We begin with our decision in Vondehn. In that case, the officers asked the defendant whether he owned a backpack found in a stopped car, whether it contained marijuana, and whether they could search it. Vondehn, 348 Or at 484. The defendant answered “yes” to each of those questions. Id. Pursuant to the defendant’s consent, the officers searched his backpack, found marijuana, advised the defendant of his Miranda rights, and then asked him additional questions about the marijuana that they had found. Id. at 484-85. On review, this court held that, under Article I, section 12, the officers should have advised the defendant of his Miranda rights before asking him whether he owned the backpack. Id. at 476. It held that the answers that the defendant gave before being advised of his Miranda rights and the marijuana that the officers found in his backpack should have been suppressed. Id. at 476-77. It also held, however, that the answers that the defendant gave after being advised of his Miranda rights should not be suppressed. Id. at 486.
Much of this court’s opinion in Vondehn focused on the state’s argument that we should interpret Article I, section 12, the same way that the plurality in United States v. Patane, 542 US 630, 124 S Ct 2620, 159 L Ed 2d 667 *372 (2004), would have interpreted the Fifth Amendment. See Vondehn, 348 Or at 470 (noting the state’s reliance on the plurality opinion in Patane).[8] This court did not accept that argument. Relying on our cases interpreting Article I, section 12, the court explained that “the Oregon Constitution requires Miranda warnings” and, as a result, the failure to give those warnings, when required, is itself a constitutional violation that requires a remedy. Id. at 475-76. The court also rejected the state’s argument that vindicating a defendant’s Article I, section 12, Miranda rights requires only that his or her unwarned statements be suppressed. Id. It held that Article I, section 12, also precludes the state from using “physical evidence that is derived from [a Miranda] violation to prosecute a defendant.” Id.
Having reached that conclusion, the court turned to the question whether the marijuana that the officers had found in the defendant’s backpack “derived from” the Miranda violation in that case. On that question, the court reasoned:
“In this court, the state makes no argument that the request for consent to search or the seizure of the marijuana derived from some source other than defendant’s answers to those unwarned questions, nor does the state argue that, even without defendant’s responses, the police inevitably would have obtained the marijuana. Thus, in this case, we conclude that the marijuana derived from the violation of defendant’s Article I, section 12, rights, and the trial court erred in failing to exclude it from evidence.”
Id. at 476-77. The court’s conclusion that the marijuana derived from the Miranda violation in Vondehn thus appears to have turned primarily on the absence of any argument to *373 the contrary. See id,.; see also id. at 490 (Linder, J., concurring) (reaching a similar conclusion).
The court then turned to the question whether the statements that the defendant made after receiving Miranda warnings should be suppressed. In analyzing that state constitutional issue, the court employed a multifactor test that it drew from Missouri v. Seibert, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004), and Oregon v. Elstad, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985). Vondehn, 348 Or at 480-81. The court explained that, in considering those factors, it was not seeking to determine whether the defendant’s warned statements were the fruit of the poisonous tree. Id. at 482.[9] Rather, it was seeking to determine whether the belated Miranda warnings were effective in ensuring that the defendant’s decision to waive his right against self-incrimination was knowing and voluntary. Id. Considering those factors, the court concluded that the belated Miranda warnings in that case had been effective. Id. at 486.
The statements that the court held admissible in Vondehn followed belated Miranda warnings, and the test that the court articulated (whether the belated warnings were effective) applies in that circumstance. When no belated Miranda warnings have been given, the question whether the taint flowing from a Miranda violation has been attenuated will vary depending on the totality of the circumstances. See State v. Jarnagin, 351 Or 703, 716, 277 P3d 535 (2012). In deciding whether the taint has been attenuated, the court has considered, among other things:
“the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements.”

Id.

*374 With that background in mind, we turn to this case. At first blush, the holding in Vondehn regarding the search of the defendant’s backpack in that case would seem to control the resolution of this case. As in Vondehn, the deputies in this case did not advise defendant of his Miranda rights before obtaining his consent to search his car. This case differs from Vondehn, however, in at least two respects. As discussed above, this court did not have occasion in Vondehn to explore, at any length, whether the marijuana found in the defendant’s backpack in that case derived from the preceding Miranda violation, in large part because the state had not argued that it did not. Here, the state has argued that the physical evidence that the deputies found did not derive from the Miranda violation. Moreover, as is often true in cases such as this, the issue in this case arises in a different factual posture from the issue in Vondehn. As discussed below, Robeson’s unwarned question in this case was open-ended; defendant’s direct response to the question was exculpatory; and he invited the deputies to search his car without an express request for consent.
We accordingly cannot say that the specific holding in Vondehn controls our resolution of this case, and we look instead to the factors identified in Jarnagin to determine whether the physical evidence that the deputies found in defendant’s car was the product of the preceding Miranda violation. On that issue, we note that the amount of time that passed between the Miranda violation and the discovery of the physical evidence was brief. Additionally, defendant remained in custody during the encounter. In those respects, this case is similar to Vondehn. As noted above, however, this case differs from Vondehn in other respects, and we focus initially on the primary factual difference, defendant’s invitation to search his car. See Jarnagin, 351 Or at 716 (explaining that, in deciding attenuation, we consider, among other things, “subsequent events that may have dissipated the taint of the earlier violation”).
When Sergeant Robeson asked defendant “if there was anything we should be concerned about” in his car, defendant “told [him] ‘no,’ and that if [the officers] wanted to search the vehicle [they] could.” Defendant’s answer *375 divides into two parts: (1) a statement that nothing in his car should concern the officers and (2) an invitation to the officers to search his car if they wanted to do so. The second part of defendant’s answer can be viewed in one of two ways: either as a volunteered response that was admissible in defendant’s criminal trial or, even if defendant’s response were not admissible in his criminal trial, as evidence of attenuation that was relevant to his motion to suppress and admissible in the hearing on that motion. Cf. State v. Wright, 315 Or 124, 131, 843 P2d 436 (1992) (explaining that the fact that evidence is inadmissible under the evidence code at trial does not mean that it is inadmissible in deciding a motion to suppress).
We begin with the first way of looking at defendant’s response. The trial court found that defendant had “volunteered” the invitation to search. The concept of a volunteered statement has a unique place in Miranda jurisprudence. In announcing the requirement that officers advise custodial suspects of their rights before questioning them, the United States Supreme Court was careful to recognize that that requirement does not preclude the admission of a defendant’s volunteered statements in his or her criminal trial. Miranda v. Arizona, 384 US 436, 478, 86 S Ct 1602, 16 L Ed 2d 694 (1966) (“Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.”).
The volunteered statements that the Court discussed in Miranda were statements that a suspect made in custody without any questioning by the police. See id.; Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Oris S. Kerr, 2 Criminal Procedure § 6.7(d) (3d ed 2007 & Supp 2014) (discussing volunteered statements). Other courts have recognized that the concept also applies to nonrespon-sive statements that a suspect makes during custodial questioning. See LaFave et al, 2 Criminal Procedure § 6.7(d) (discussing cases). Specifically, those courts have held that, to the extent that a defendant’s answer is not responsive to the officer’s question, then the answer is a volunteered statement, as the Court used that term in Miranda, and admissible in the defendant’s criminal trial. See id.
*376 In this case, defendant’s invitation to search his car was nonresponsive in one sense. Robeson did not ask if he could search defendant’s car. He asked if there was anything in the car that he should be concerned about. Defendant’s answer went beyond what Robeson had asked and included an offer for the officers to search his car “if [they] wanted to.” As defendant argues, however, Robeson’s question can be viewed as prompting the second part of defendant’s answer. See State v. Unger, 356 Or 59, 79, 333 P3d 1009 (2014) (explaining that asking a defendant whether he had any drugs or guns in his apartment could be viewed as prompting the defendant’s invitation to “go ahead and look”). Viewed in that manner, the second part of defendant’s answer may not be sufficiently nonresponsive to come within the concept of a “volunteered” statement that the Court identified in Miranda and thus may not be admissible as evidence in defendant’s criminal trial.[10]
Even if we assume that defendant’s response to Robeson’s question was not “volunteered,” as the Court used that term in Miranda, defendant’s response still reflects a volitional act on his part and, as such, implicates another strand of our case law. In considering a related issue, this court has held that similar offers are sufficient to attenuate the taint of an Article I, section 9, violation. State v. Rodriguez, 317 Or 27, 854 P2d 399 (1993); State v. Kennedy, 290 Or 493, 624 P2d 99 (1981).[11] The point of those cases is not that the statement itself (the defendant’s offer) was *377 admissible in the defendant’s criminal trial. Rather, the point is that the offer was sufficient to attenuate the taint of the preceding constitutional violation, making subsequently discovered evidence admissible.
This court’s decision in Kennedy illustrates that line of cases. In Kennedy, the police approached the defendant as he was leaving the Portland airport. 290 Or at 495. Acting on information that the defendant fit a “drug smuggler’s profile,” the officers asked to talk to him. Id. When the defendant asked one of the officers why they wanted to talk, the officer explained that he “had information that led [him] to believe that [defendant] may be carrying narcotics on his person or in his luggage.” Id. at 496 (brackets in original). “Defendant denied that he was carrying narcotics and said, ‘Would you like to search my luggage?”’ Id. The court noted that, when the defendant made that offer, the officer “had not made any request for consent to search [the] defendant or his luggage.” Id. During the ensuing search, the officers found and seized a vial with cocaine residue on it. Id.
In deciding whether that evidence was the product of an unlawful stop, this court assumed that the officers had stopped the defendant and that they lacked reasonable suspicion to do so. Id. at 499. The court also recognized that the stop was the “but for” cause of the officers’ discovery of the evidence. Id. at 500-01. However, relying on, among other things, the “defendant’s offer to let [the officer] search his luggage without a prior request for consent,” the court concluded that the discovery of the evidence was sufficiently attenuated from any illegality to say that it did not derive from it. Id. at 504-06 (explaining that the defendant’s unsolicited offer to search was the “[m]ost importan [t]” consideration in reaching its conclusion). The decision in Rodriguez is to the same effect.[12] See also State v. Crandall, 340 Or *378 645, 136 P3d 30 (2006) (defendant’s unilateral act in hiding drugs under a parked car after officers unlawfully had stopped and directed him to come over and talk to them attenuated the taint of the unlawful stop).
In Unger, this court explained that Kennedy and Rodriguez stand for the proposition that, “in some situations, a defendant’s voluntary consent itself may be sufficient to demonstrate that the unlawful conduct did not affect or had only a tenuous connection to the evidence produced.” 356 Or at 77-78. Unger thus reaffirmed that, when a defendant’s consent to a search either was not affected by or was only tenuously connected to a prior illegality, the defendant’s voluntary consent can be sufficient to break the causal chain. The court identified three factors that bear on when voluntary consent will attenuate a prior illegality:
“That legal determination — whether, in the circumstances of a particular case, consent has so attenuated the connection between the prior illegal conduct and the evidence obtained in the consent search — requires a court to consider the illegal conduct that comprised the stop or search, the character of the consent, and the causal relationship between the two.”
Id. at 78.[13]
Regarding the first factor (the nature of the illegal conduct), the state has conceded that Robeson violated defendant’s Article I, section 12, rights when he asked him if there was anything in his car that should concern the deputies. That violation can hardly be characterized as egregious, however. This was not the sort of prolonged stationhouse questioning that concerned the United States Supreme Court in Miranda. See 384 US at 448-55 (describing interrogation techniques designed to break down a suspect’s will). Robeson did not engage “in repeated efforts to wear down [defendant’s] resistance.” See State v. Foster, 288 Or 649, 655-56, 607 P2d 173 (1980) (considering that situation) (internal quotation marks omitted); State v. Mendacino, *379 288 Or 231, 238, 603 P2d 1376 (1980) (same). The trial court found that only two to three minutes elapsed between the time that Robeson stopped defendant and defendant’s invitation to search his car. And other than the initial background questions he asked, Robeson asked defendant only one question: “ [I]f there was anything we should be concerned about” in defendant’s car.
Defendant has not argued that his response to that question was “actually coerced” within the meaning of Article I, section 12, nor could he reasonably do so. Similarly, he has not argued that Robeson deliberately sought to violate his state constitutional rights. Although Robeson’s question went too far, his question was not dissimilar from a question that the Court of Appeals had held falls within an exception to the state constitutional Miranda requirement. See State v. Cunningham, 179 Or App 498, 504, 40 P3d 535 (2002) (asking defendant “whether he had anything that was sharp or would hurt him” before the officer performed a lawful pat-down search did not constitute “interrogation” as defined by the United States Supreme Court and adopted by the Oregon Supreme Court).[14] The violation was not egregious.
The second factor we consider is the character of defendant’s consent. As noted, defendant invited the deputies to search his car if they wanted to do so. Defendant’s invitation to search his car in this case is virtually identical to the invitations in Kennedy and Rodriquez, which this court held attenuated the taint of the unlawful seizures in those cases. It may be that Robeson’s question in this case prompted defendant’s invitation to search his car, as defendant argues, but the question that Robeson posed was more open-ended and thus more benign than the officers’ statements in Kennedy and Rodriguez. In Kennedy, the officer told the defendant that they had reason to believe that he *380 had drugs on his person or in his luggage. 290 Or at 496. In Rodriguez, the officer asked if the defendant had any drugs or guns in his apartment. Rodriguez, 317 Or at 30. In this case, Robeson asked only whether there was anything that the deputies should be concerned about in defendant’s car.
Finally, we consider the causal connection between the violation and defendant’s invitation. This is not a case in which Robeson’s unwarned questioning left “‘little, if anything, of incriminating potential * * * unsaid.’” See Jarnagin, 351 Or at 722 (quoting Seibert, 542 US at 616-17 (plurality opinion)). Rather, defendánt told the deputies that he did not have anything of concern in his car before extending an invitation to them to search his car if they wanted to. Not only did the deputies not trade on the first part of defendant’s response, but there was nothing on which to trade. Nothing that defendant said in the first part of his response to Robeson’s unwarned question impaired defendant’s ability to make an independent decision to invite the deputies to search his car if they wanted to do so. In that respect, this case is no different from Kennedy and Rodriguez. Under the analysis in Kennedy and Rodriguez, defendant’s invitation to search his car attenuated the taint flowing from Robeson’s unwarned question. The evidence that the deputy found in defendant’s car did not derive from the preceding Miranda violation.[15]
Defendant and the two dissenting opinions take a different position. They reason that, even if the invitations to search in Kennedy and Rodriguez were sufficient to attenuate the taint of the Article I, section 9, violations in those cases, defendant’s invitation in this case is not sufficient to *381 remedy the taint of a Miranda violation. We begin with an argument that defendant alone advances.
Defendant argues that Kennedy and Rodriguez are inapposite because, under Article I, section 12, his invitation to search his car will attenuate the taint of the Miranda violation only if the invitation was extended with knowledge of his right against self incrimination. As defendant notes, this court stated in Vondehn that Article I, section 12, requires Miranda warnings “to ensure that a person’s waiver [of his or her Article I, section 12, rights] is knowing as well as voluntary.” See Vondehn, 348 Or at 474. It follows from that proposition, defendant contends, that, because his invitation to search his car was made without knowledge of his Miranda rights, that invitation should have little or no weight in the attenuation analysis.
One difficulty with that argument is that it fails to distinguish two separate issues. The issue in this case is not whether defendant’s response to Robeson’s question was knowing and thus admissible in his criminal trial. It may not have been.[16] Rather, the issue in this case is whether defendant’s response was admissible in the hearing on his suppression motion to determine whether the physical evidence discovered in his car derived from the Miranda violation. On the latter question, defendant offers no basis for saying that his invitation to search cannot be considered at a suppression hearing as evidence of attenuation. Cf. Wright, 315 Or at 131 (explaining that the fact that evidence is inadmissible under the evidence code at trial does not mean it is inadmissible in determining a motion to suppress).
We customarily have considered a suspect’s responses to unwarned questioning in determining whether subsequently discovered evidence derived from or was a product of an earlier Miranda violation. See Jarnagin, 351 Or at 722-23 (considering the defendant’s responses to unwarned questioning in deciding attenuation); Vondehn, *382 348 Or at 485-86 (same). For example, among the factors that we considered in deciding attenuation in Jarnagin were “the use that the state has made of the unwarned statements” and whether “the unwarned interrogation left ‘little, if anything, of incriminating potential * * * unsaid.’” See 351 Or at 716, 722 (quoting Seibert, 542 US at 616-17 (plurality opinion)). Those factors necessarily entail considering a defendant’s responses to unwarned questioning in deciding whether subsequently discovered evidence was the product of an earlier Miranda violation.[17]
Defendant advances a second argument, which both dissents also raise. They reason that, even if defendant’s invitation would have been sufficient to attenuate the taint of an unconstitutional seizure, as this court held in Kennedy and Rodriguez, something more is required to attenuate the taint of a Miranda violation. They conclude that, because Miranda requires warnings following an arrest and because an arrest entails a greater level of restraint than a stop, an event that will be sufficient to attenuate the taint of an unlawful stop will be insufficient to attenuate the taint of a Miranda violation. Neither defendant nor the dissenting opinions, however, cite any case that stands for that categorical proposition. If anything, the cases that address the issue have held that less is required to attenuate a Miranda violation than is required to attenuate an unconstitutional seizure. See Dickerson v. United States, 530 US 428, 440-41, 120 S Ct 2326, 147 L Ed 2d 405 (2000); Elstad, 470 US at 306; Patane, 542 US at 644-45 (Kennedy, J., concurring in the judgment).
The United States Supreme Court explained in Elstad that “a procedural Miranda violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the ‘fruits’ doctrine.” 470 US at 306. The Court accordingly held in Elstad that the defendant’s subsequent warned statements were admissible against him in his criminal trial *383 without regard to whether those statements were the fruit of his earlier admissions obtained in violation of Miranda. See id. at 316-17; see also Seibert, 542 US at 612 n 4 (plurality opinion) (same). And the Court rejected an argument in Elstad that the degree of attenuation required to purge the taint of coerced or compelled statements applies equally to statements obtained as a result of a “technical]” Miranda violation. 470 US at 318.
To be sure, in Elstad, the Court justified a more limited remedy for Miranda violations than Fourth Amendment violations on the ground that Miranda was a judge-made rule, not a constitutional right. See id. at 305-06. Since then, however, the Court has recognized that Miranda warnings are “constitutionally based,” but it has adhered to its conclusion in Elstad that Miranda violations do not require as extensive a remedy as a Fourth Amendment violation and that the same degree of attenuation is not required. Dickerson, 530 US at 440-41; accord Seibert, 542 US at 612 n 4 (plurality opinion).
As we read those decisions, they adhered to the conclusion in Elstad because of the prophylactic nature of the Miranda right. The purpose of Miranda warnings is “ [t] o protect a person’s right against compelled testimony.” Jarnagin, 351 Or at 713. To ensure that that right is protected, the United States and Oregon constitutions require officers to advise suspects who are in custody or comparable circumstances of their Miranda rights. However, this court has never equated the point at which the Miranda right attaches with the point at which a person’s statements are either actually compelled or coerced. See id. at 724 (distinguishing statements obtained in violation of a defendant’s Article I, section 12, right to Miranda warnings from statements obtained in violation of Article I, section 12, as a result of actual coercion). Between those two points lies a range of circumstances that can affect whether subsequently discovered evidence derives from the failure to give required Miranda warnings.
In this case, defendant was in custody or comparable circumstances, and his Miranda rights attached at that point. The dissents would give talismanic significance to *384 that fact and hold that, as a result, defendant was disabled from inviting the officers to search his car. As we explained in Jarnagin, however, the question whether the circumstances are sufficient to attenuate the taint of an officer’s failure to give Miranda warnings will turn on the facts of each case. 351 Or at 716. That entails a consideration of the extent to which the nature and extent of the custodial questioning affected a suspect’s decision to invite the search.
In this case, we are hard pressed to say that the failure to give required Miranda warnings disabled defendant from making an independent decision. It is true that defendant was in custody or comparable circumstances. However, that is true in every case in which an officer fails to give required Miranda warnings. Defendant was not detained in the stationhouse for an extended period of time, nor was he subjected to the sort of extended questioning that caused the Court to require Miranda warnings in the first instance. Rather, the detention was brief, only two to three minutes the trial court found. Robeson asked only one question that went beyond determining defendant’s identity, and defendant’s response to that question was not inculpatory.[18] Given those circumstances, we conclude that our holdings in Kennedy and Rodriguez provide persuasive guidance for deciding this case.
One other consideration cuts against the conclusion that defendant urges and that the dissents would reach. Defendant concedes in his brief on the merits that an officer lawfully may ask a suspect who is in custody or compelling circumstances for consent to search without first advising the suspect of his or her Miranda rights. It follows that, if the suspect consents and the officer finds incriminating evidence in the ensuing search, that evidence will be admissible in the suspect’s criminal trial, even though the suspect *385 was in custody or compelling circumstances when he or she consented.
If, as defendant concedes, an officer need not advise a suspect in custody of his or her Miranda rights before asking for consent to search, it is difficult to see why a suspect who is in custody cannot invite an officer to search. It may be, as defendant argues, that Robeson’s question prompted defendant’s invitation in this case. But, even if that is true, then Robeson’s question functioned implicitly the same way that an explicit request for consent would have, and defendant points to nothing in the first part of his answer to Robeson’s question (that there was nothing in his car of concern to the deputies) that would have affected or somehow tainted his decision to invite the deputies to search his car. Given Kennedy, Rodriguez, and defendant’s concession, we are not persuaded that we should automatically give less effect to invitations to search that follow a Miranda violation than we give invitations to search that follow an unlawful seizure.
One final matter requires discussion. At trial and on appeal, defendant argued that the deputies exceeded the scope of his invitation when they opened a fanny pack they found in his car, which contained methamphetamine and drug paraphernalia. The Court of Appeals did not reach that issue because it held that defendant’s invitation to search his car and the resulting search were the fruit of the Miranda violation. Because we reach a different conclusion, it is necessary to resolve defendant’s argument that the officer’s search exceeded the scope of defendant’s invitation. The parties have not briefed that issue on review, and we conclude that the case should be remanded to the Court of Appeals so that it can decide that issue in the first instance.
If the Court of Appeals finds that the deputy’s search did not exceed the scope of defendant’s invitation, then the remaining question is whether the statements that defendant made to the deputy after receiving belated Miranda warnings were admissible. As we understand defendant’s argument on that issue, it rests on the proposition that the deputies unlawfully discovered the physical evidence in his car and that, as a result, the belated Miranda warnings *386 he received were not effective to render his statements voluntary. If the deputies lawfully discovered the physical evidence in defendant’s pack, then the physical evidence and defendant’s warned statements presumably would be admissible. Conversely, if the deputy’s search exceeded the scope of defendant’s consent, then the question will be, as it was in Vondehn, whether the belated Miranda warnings were effective. See Vondehn, 348 Or at 485-86 (holding that belated Miranda warnings were effective even though officers unlawfully had discovered marijuana in the defendant’s backpack).
The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this decision.

 We take the facts from the hearing on defendant’s suppression motion and state them consistently with the trial court’s ruling.

 Robeson testified at the suppression hearing that he separated defendant from the passenger so that she could not conform her answers to defendant’s. At the suppression hearing, defendant did not challenge Robeson’s decision to handcuff him. Perhaps for that reason, neither the state nor defendant asked Robeson about the circumstances that led him to do so.

 Justice Baldwin’s dissent states that “Robeson questioned [defendant] about illegal activity unrelated to the stop without first warning him that he had a right to remain silent.” 357 Or at 398-99 (Baldwin, J., dissenting). Justice Walters’ dissent contains a similar statement. To the extent that the dissents suggest that Robeson asked defendant something other than (1) questions about defendant’s identity and (2) “if there was anything [the deputies] should be concerned about” in defendant’s car, that suggestion does not appear consistent with the record.

 Defendant, for his part, denied that he “volunteer [ed]” that Robeson could search his car. However, he agreed that he consented to a search of his car. Defendant testified that Robeson asked him, “[I]f he could search — if I minded if he searched the vehicle.” Defendant testified that he “told [Robeson] I don’t care but I got a whole bunch of stuff in the trunk of the car. You know, ‘I’d like you to put it back when you’re done.’”

 Defendant did not argue in the trial court that the previous questions that Robeson asked regarding defendant’s identity constituted interrogation or that, in asking those questions, Robeson had violated his Miranda rights. Cf. State v. Cunningham, 179 Or App 498, 501, 40 P3d 535 (2002) (explaining that the federal definition of interrogation, which this court adopted for the purposes of Article I, section 12, contains an exception for questions “normally attendant to arrest and custody”).

 Defendant also argued that, even if he invited the deputies to search his car, the scope of his consent did not extend to opening the fanny pack in his car, where the deputies found methamphetamine and drug paraphernalia. The Court of Appeals did not reach that issue, and the parties have not briefed it on review.

 The fruit of the poisonous tree has been defined as “challenged evidence [that] is ‘secondary’ or ‘derivative’ in character,” as when “a confession is obtained after an illegal arrest, physical evidence is located after an illegally obtained confession, or an in-court identification is made following an illegally conducted pretrial identification.” Wayne R. LaFave, Jerold H. Israel, Nancy J. King, Orin S. Kerr, 3 Criminal Procedure § 9.3(a) (3d ed 2007 & Supp 2014).

 The plurality opinion in Patane would have held that, under the Fifth Amendment, the “mere failure to give Miranda warnings does not, by itself, violate a suspect’s constitutional rights or even the Miranda rule.” 542 US at 641 (opinion of Thomas, J.). In the plurality’s view, “[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.” Id. The plurality reasoned that, because the mere failure to advise a suspect of his or her Miranda rights does not violate either the Fifth Amendment or the Miranda rule, there is no reason to apply the “fruit of the poisonous tree” doctrine to that failure. Id. at 643-44. It followed, the plurality reasoned, that excluding statements obtained in violation of Miranda from a defendant’s criminal trial is the only remedy that the Fifth Amendment requires. Id. at 644.

 The court explained that
“a court does not use those circumstances to attempt to determine the psychological effect that the particular police course of conduct had on the particular defendant or whether the initial failure to warn caused the particular defendant to make the post-Miranda statements.”
Vondehn, 348 Or at 482. Rather, the test was an objective one. Id.

 Justice Baldwin’s dissent devotes some time to explaining that defendant’s invitation to search his car was not volunteered. We note that Robeson testified that defendant’s invitation was “volunteered,” and the trial court expressly credited Robeson’s testimony on that point. As a factual matter, describing defendant’s invitation as “volunteered” seems accurate. Of course, the legal effect of that invitation is a separate question. And, as we explain above, we assume that defendant’s invitation was not “volunteered” in the sense that the Court used that term in Miranda. It follows, we think, that our difference with the dissent on this point is not substantial.

 The issue in those Article I, section 9, cases was whether a defendant’s invitation to search his or her effects attenuated the taint of an unlawful seizure. The issue in this Article I, section 12, case is whether defendant’s invitation to search attenuated the effects of an unwarned question that followed a lawful custodial seizure. Both types of cases involve situations that can influence a defendant’s ability to make an independent decision. And, as the concurrence explains, the factors that we have considered in deciding attenuation in both situations are virtually the same.

 In Rodriguez, state and federal officers arrested the defendant at his home. 317 Or at 29. The officers advised the defendant of his Miranda rights. Id. at 30. In response to the question, “Do you have any drugs or guns in the house,” the defendant replied, “No, go ahead and look.” Id. The officers did so and found a gun, which the defendant later sought to suppress as the product of an unlawful arrest. Similarly to Kennedy, the court accepted the state’s concession that the arrest violated Article I, section 9. Id. at 37. The court also recognized that the arrest was the “but for” cause of defendant’s statement, “Go ahead and look.” Id. at 39-40. The court concluded, however, that defendant’s unsolicited offer *378 to search his house sufficiently attenuated the taint of the unlawful arrest and upheld the admission of the evidence found in the ensuing search. Id. at 41-42.

 The factors that the court identified in Unger are a subset of the factors that the court identified in Vondehn and Jarnagin.

 We express no opinion on whether the Court of Appeals was correct in Cunningham in applying that exception to the definition of “interrogation.” We note the Court of Appeals decision only to observe that Robeson’s question was similar to one that the Court of Appeals had approved. Robeson’s question differed in two respects, however. Unlike the question in Cunningham, which focused on harm to the officer as he carried out procedures designed to effectuate a lawful seizure, Robeson’s question was not limited to officer safety, and it asked about items in the car even though defendant was handcuffed and seated in the deputy’s patrol car.

 Justice Walters’ dissent compares this case to Jarnagin, where the officers obtained from defendant, during multiple extended interviews in violation of Miranda, an explanation as to how his daughter had been injured and an agreement to reenact that explanation the next morning while the officers videotaped him. 351 Or at 718. Our holding that the resulting videotape was the product of the earlier violations turned in large part on the fact that the defendant’s unwarned statements formed the script that he acted out the next morning while being videotaped. Id. We do not view the specific circumstances that we considered in Jarnagin, as the dissent appears to do, as exhausting the totality of the circumstances that can bear on whether subsequently discovered evidence is the product of an earlier Miranda violation. Nor do we view Jarnagin as standing for the proposition that a defendant’s voluntary invitation to search can never attenuate the taint of a Miranda violation.

 In the trial court, defendant did not move to suppress his response to Robeson’s question. He moved to suppress the physical evidence found in his car and the warned statements that he later made. In any event, even if defendant had moved to suppress his response to Robeson’s question and even if that response should not have been admitted in his criminal trial, any error in admitting the response was harmless.

 There is a suggestion in Justice Walters’ dissent that, because defendant did not know that he had a right to remain silent, his invitation to search his car cannot be considered in deciding attenuation. That reasoning proves too much. If that were correct, no invitation to search following a Miranda violation could be considered without belated Miranda warnings.

 Justice Walters’ dissenting opinion states that the deputies “went on a fishing expedition — deliberately interrogating defendant and seeking incriminating evidence without first warning defendant of his right to remain silent and consult a lawyer.” 357 Or at 397 (Walters, J., dissenting). The trial court did not find, however, that the deputies “deliberately interrogat[ed]” defendant, nor did it find that they were on a “fishing expedition” or “seeking incriminating information.” What Robeson actually said to defendant (even the words that defendant recounted) seems far milder than might appear from the dissent’s description of the events.